UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

**MELANIE MAYES and BRIAN MICHAEL
MAYES, JR.,**

                    **Plaintiffs,**

            **-v-**                                    **1:13-CV-370 (NAM/CFH)**

**THE VILLAGE OF HOOSICK FALLS, KEITH
JOHNSON, AND HAROLD McCLELLAN,**

                    **Defendants.**

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

APPEARANCES:

Law Offices of Elmer Robert Keach, III, P.C.
Elmer R. Keach, III, Esq., of counsel
Maria K. Dyson, Esq., of counsel
One Pine West Plaza - Suite 109
Albany, New York 12205
Attorneys for Plaintiffs

Hon. Eric T. Schneiderman, Attorney General of the State of New York
Mark G. Mitchell, Esq., Assistant New York State Attorney
The Capitol
Albany, New York 12224
and
Burke, Scolamiero, Mortati and Hurd, LLP
Thomas J. Mortati, Esq., of counsel
7 Washington Square
Albany, New York 12212
Attorneys for Defendants

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        In this action under 42 U.S.C. § 1983 ("section 1983"), plaintiff Melanie Mayes and her

son, plaintiff Brian Mayes, Jr., born in 1994, claim that their Fourth Amendment protections

against unreasonable search and seizure were violated by defendants Assistant Police Chief

Harold McClellan ("Chief McClellan") and Patrolman Keith Johnson ("Officer Johnson"), both of the Police Department of the Village of Hoosick Falls ("Village"). Plaintiffs' claims of unreasonable entry and search of their residence and unreasonable seizure of Brian Mayes' person arise from an incident occurring on November 8, 2012, when, in response to a 911 dispatch, Chief McClellan and Officer Johnson went to the residence at 31 Lyman Street in Hoosick Falls, New York, where Melanie Mayes and Brian Mayes lived with Robert Sanderson, Jr. ("Sanderson"), Melanie Mayes' fiancé. Plaintiffs also assert state law claims of assault, battery, and intentional and negligent infliction of emotional distress.

Defendants move for summary judgment (Dkt. No. 41). As explained below, the Court grants the motion and dismisses the action in its entirety with prejudice.

## AMENDED COMPLAINT

The amended complaint (Dkt. No. 25) alleges the following facts:[1]

> 9. Plaintiff Melanie Mayes is the mother of Plaintiff Brian Michael Mayes, Jr, who was 17 years old when the events giving rise to this Complaint occurred. Brian is mentally disabled and receives SSI due to his disability.
> 10. On or about November 8, 2012, Brian was at his home, located at 31 Lyman Street, Hoosick Falls, playing with a friend when two policemen called out to him through an open window. One officer was dressed in a Hoosick Falls Police uniform, and the other in plainclothes. These officers were later identified by the Plaintiffs as being Defendants Keith Johnson and Harold McClellan (the "Individual Defendants").
> 11. The Individual Defendants asked Brian if someone had called 911 from a land-based phone line. Brian replied negatively and explained that his home did not have a land-based phone line.
> 12. The Individual Defendants became angry and started banging on the front door.
> 13. Brian ran downstairs and one of the officers kicked the door open into his face, causing damage to the door.

---

[1] Throughout this Memorandum-Decision and Order, the Court quotes directly from the record without noting or correcting errors.

-2-

14. One Defendant, likely Defendant Keith Johnson, grabbed Brian, pushed and handcuffed him, and then shoved him into a couch. He then dragged Brian out the front door and onto the porch, where he continued to shove and strike Brian.

15. In his report, Defendant Johnson detailed that Brian Mayes was arrested "while inside, PTL Johnson saw 2 white males, and both were asked to provide identification. Neither male could provide photo identification, but one male gave his name as Brian Mayes, Jr., and the other gave his name as [M.S.]. When asked, neither individual could state what they were doing inside the house, or what they were doing when they said don't answer the door it's the police. Both subjects were placed in handcuffs, and detained in police vehicles." A copy of Patrolman Johnson's report is attached to this Amended Complaint as Exhibit A.

16. Mr. Mayes lived in the home, and committed no crime. Mr. Mayes could not provide photo identification because, upon information and belief, he did not have any. [M.S.] was his invited guest in the home. Even a basic inquiry by Defendant Johnson would have revealed these facts. Common sense would further detail that individuals do not dial 911 when committing a burglary. Officer Johnson had no warrant to arrest Mr. Mayes in his home, nor did he have a warrant to enter the home.

17. Brian was eventually dragged into a police cruiser, still handcuffed.

18. Neither officer explained why Brian had been arrested or why they had forcefully entered his home.

19. At this point, Ms. Mayes awoke from the noise downstairs. She saw the Individual Defendants outside her bedroom and demanded to know why they were inside her home. They stated that someone had called 911 from a land-based phone line.

20. Ms. Mayes stated that they had no such phone line and ordered them to leave the premises. She immediately noticed that she did not see Brian and asked the Individual Defendants where her son was.

21. The Individual Defendants ran downstairs and Ms. Mayes followed, yelling that her son was disabled and demanding to know where he was. She followed the officers outside and continued to ask for her son.

22. At this point, Ms. Mayes heard her son weeping and yelling for his mother, and she saw Brian locked in the backseat of the police cruiser, handcuffed and crying. Ms. Mayes demanded that her son be released. The Individual Defendants agreed, let Brian out of the car and removed his handcuffs.

23. Brian began crying louder in pain and Ms. Mayes noticed red, raised welts on his wrists and bruises on his forearms.

24. Shortly after, Ms. Mayes took Brian to Southwestern Vermont Medical Center, where he was treated for wrist contusions and abrasions. He was also diagnosed with peripheral neuropathy.

25. When they returned home several hours later, they noticed that their home

had been searched in their absence. Specifically, Brian's bedroom had been searched and Ms. Mayes recreation room had been forcibly unlocked and sealed bins inside had been opened and searched. At no time did the Individual Defendant produce a warrant to enter or search the Mayes home. Upon information and belief, no such warrant exists.

26. As a result of the assault and "arrest" by Hoosick Falls Police Officers, Brian has suffered physical injuries, together with psychological trauma.

Officer Johnson's incident report, cited in paragraph 15 of the amended complaint and attached thereto as Exhibit A, states:

On the above date and time, units were dispatched to the above location for a report of a 911 open line. RCBES also advises that they can hear things in the background, and believe that their may be a burglary going on at that address. Upon arrival, PTL Johnson knocked on the front door of the residence, and their was no answer. PTL Johnson knocked multiple times, and their was no answer. Shield 2 received a phone call from RCBES stating that their are people in the house, and that they are saying that the police are here. RCBES also states that it sounds like the people were trying to break into a lock. While standing at my patrol vehicle, PTL Johnson observed a white male standing in the window, and the male opened the window. PTL Johnson requested that they come down stairs so they could be interviewed. A short time later, the front door to the residence opened, and upon request, the subjects allowed PTL Johnson inside the residence. While inside, PTL Johnson saw 2 white males, and both were asked to provide identification. Neither male could provide photo identification, but the one male gave his name as Brian Mayes Jr., and the other gave his name as [M.S.]. When asked, neither individual could state what they were doing inside the house, or what they were doing when they said don't answer the door its the police. Both suspects were placed in handcuffs, and detained in the police vehicles. [Each] party was again questioned separately on what was going on, and why they weren't going to answer the door for the police, and neither would state what was going on. When advised that the reason the police were there was because of a 911 open line call. PI/B.M. Mayes states that his house doesn't have a home phone in it. He was then advised that it must have come from a cellular phone, and both parties stated they didn't have cell phones with them. PTL Johnson then entered the house to make sure the building was secured, and when inside on second in the hallway, PTL Johnson announced his presence, and a female came out of a bedroom stating that she was the owner of the house, and requested I leave the house immediately. PTL Johnson then left the house, and a short time later, PI/M.L. Mayes came outside, and requested to know what was going on. PTL Johnson then advised her of the situation, and that her son was being detained until the situation could be figured out.

-4-

PI/M.L. Mayes then identified PI/B.M. Mayes as her son, and that he lives there. Both subjects were then released. It was discovered through the investigation, that PI/[M.S.] did possess a cell phone, and that the phone call came from his phone. He stated he didn't recall making the call, and was then advised that it could have dialed while it was in his pocket. PI/[M.S.] was advised by PI/M.L. Mayes that he was not welcome in her house, and PI/[M.S.] was transported to the station so he could find a safe place to go. Units returned to service. Incident CBI.

The amended complaint asserts the following causes of action:

First: Section 1983 claim by Brian Mayes against all defendants for unreasonable seizure of his person in violation of the Fourth Amendment;

Second: Section 1983 claim by Brian Mayes against all defendants for excessive force in violation of the Fourth Amendment;

Third: Section 1983 claim by Melanie Mayes and Brian Mayes against all defendants for unreasonable search of their residence in violation of the Fourth Amendment;

Fourth: Section 1983 claim by Melanie Mayes and Brian Mayes against Village for municipal liability under *Monell*;

Fifth: New York common-law claim by Brian Mayes against all defendants for assault and battery; and

Sixth: New York common-law claim by Brian Mayes against all defendants for intentional or negligent infliction of emotional distress.

The amended complaint seeks compensatory and punitive damages.

## DISCUSSION

### Standard on Summary Judgment

The party moving for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the burden shifts to the non-movant to adduce evidence establishing the existence of an

issue of material fact.  *See Linares v. McLaughlin*, 423 Fed.Appx. 84, 86 (2d Cir. 2011).  If the non-movant fails to make such a showing, the movant is entitled to summary judgment.  When deciding a summary judgment motion, a court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted).  Conclusory statements or mere allegations, however, are not sufficient to defeat a summary judgment motion.  *Id.*  The court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," and grant summary judgment where the non-movant's evidence is conclusory, speculative, or not significantly probative.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986).  "[T]he party opposing summary judgment may not rely on 'speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"  *Asante-Addae v. Sodexo*, __ F.3d __ (2d Cir. January 22, 2016) (quoting *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

**Warrantless Entry and Search – Facts**

The Court first addresses the third cause of action in the amended complaint, a section 1983 claim by Melanie Mayes and Brian Mayes against all defendants for unreasonable entry and search in violation of the Fourth Amendment.  At 2:17 p.m. on November 8, 2012  the Rensselaer County 911 system received a 911 call.  The detail call sheet states the following:

> 911 open line
> Sounds like 2 males trying to enter a bldg that is locked
> Call maps out to above address but may be next door
> Line is still open

> Heard voices of 2 male subjects and intermittent conversation also when police got there one answered the door and the other was scared about what was going on kept say oh shit, oh shit over and over then asked the one who answered the door are they coming up? He sounded real nervous Earlier one asked the other if the cables were with it and one asked if it was locked could they get in at the beginning of the conversation

The detail call sheet shows that police were dispatched at 2:21 p.m. Officer Johnson (Vehicle 503) was at the scene at 2:23 p.m.; Chief McClellan (Vehicle 501) arrived at 2:25 p.m. The dispatcher cleared the incident at 2:39 p.m., 16 minutes after Officer Johnson arrived.

The audio recording of the 911 police dispatch begins as follows:

> Number 31 Lyman Street
> It's a 911 open line
> It sounds like there's two males trying to enter a building ... and that it's locked
> Call maps out to that address or next door to that address
> The line is still open

Officer Johnson and Chief McClellan, the two Hoosick Falls police officers on duty at the time, responded to the 31 Lyman Street address. No other officer responded at any time.

The recording of the open 911 call, while mostly incomprehensible, shows that 1:19 minutes into the call, a male voice says "It's locked." At 8:01 minutes into the call, a male voice says, "Shit, it's the cops." At around 8:40, it sounds as if someone is walking down a flight of stairs. At 8:57 minutes, there is a squeak and a bump, and the line goes dead.

Officer Johnson testified at his deposition that upon receiving the 911 dispatch, he went directly to the premises; that he and Chief McClellan arrived in separate police cars at about the same time; that he went to the front door and Chief McClellan went to the rear; and that he saw no signs of forced entry. Officer Johnson further testified that he knocked on the front door; that at first there was no response; that after he knocked a second time, two teenaged white males

appeared in the second floor window; and that he asked them to come downstairs, which they did.

Officer Johnson continued:

> Q. And what happened next?
> A. The door opened. I asked if I could come in and speak to them. They let me into the house and I spoke to them and asked them what was going on and explained to them the situation, what was going on and why I was there. I asked for any kind of identification on who they were. And neither of them provided government identification who they were. One of them showed me a hunting license or a fishing license. And on that aspect, that is all.
> Q. All right. So where did you – when you entered into the home, where did you go, were you in the living room, a dining room, what was the –
> A. It was the living room.
> ***
> Q. All right. Did you see any signs that the home had been burglarized in the living room?
> A. Not in the living room.
> ***
> Q. My understanding is at some point after you had taken these two youths into custody that you entered the home again?
> A. I detained both of them, correct. And once I placed them in the back of the police car, I went back into the home.
> Q. And where did you go in the home the second time that you went in?
> A. I entered back through the front door into the living room – into the living room area. On the left-hand side there was a staircase that went upstairs. There was a white sheet covering the stair – or in the doorway of the staircase. I moved the sheet aside and started to walk up the stairs and announced myself. And a white female, I would say 40s, 50s white female, I am not exactly sure, it was kind of dark up there, appeared out of a bedroom from the left-hand side of the staircase. She inquired what was going on. I explained to her the situation and she kicked me out of the house.

Questioned in more detail, Officer Johnson stated that when the youths answered the door, he asked them what they were doing. They responded that "they were looking for wires for the Xbox." Officer Johnson's testimony continued:

> Q. Okay. Tell me everything that you can remember saying to the two youths in the building besides what you have already testified to today?
> A. I believe you already mentioned who lives there, and the one did say that he lived there. I asked them what they were doing. They explained to me what they were doing. I asked their names and got their information, but ...

neither of them had ... any form of picture ID or government ID to say that they are who they are. Then I explained to them that they were going to be detained until I could figure out what exactly was going on to make sure that their story matched what was actually going on.

Q. Did either – did Mr. Mayes tell you that his mother was home?

A. I don't recall if he ever told me that she was home or not. Like I said, when I went up on the second floor and announced myself she came out of the bedroom. So I don't recall if he ever told me that she was there.

\*\*\*

Q. And you would agree with me that you placed Brian Mayes into custody inside his home without a warrant?

\*\*\*

A. He wasn't placed under arrest, he was detained so I could investigate further.

Q. Was he handcuffed?

A. Yes.

Q. And was he put in the back of a patrol cruiser?

A. Yes, he was.

Q. And he wasn't free to leave; was he?

\*\*\*

A. No.

\*\*\*

Q. And were these boys armed?

\*\*\*

A. No, they were not.

Q. Did you frisk them to see if they were armed?

\*\*\*

A. I checked their pockets. I just patted their pockets to see if there were any weapons in there. I checked their waist line. They weren't – I didn't thoroughly go through them.

Q. All right. But you checked them to see if they were armed, right?

A. Of course.

Q. And was that before or after they were detained, meaning they were handcuffed?

A. I am not sure if I did it before or after.

Officer Johnson added that he detained Brian Mayes for further investigation "because I have to go back into the house to see what was going on." He could not remember whether he handcuffed Brian Mayes and M.S. inside the house or on the front porch. Neither resisted, and the two were placed in separate patrol cars. Officer Johnson testified that he then returned to the

-9-

house; that he was inside for "probably less than a minute" before he encountered Mrs. Mayes; and that he did not look through any of their possessions while he was in the house.

> Q. So what happened after Mrs. Mayes kicked you out of the home?
> A. I walked down the stairs, walked through the living room and back outside. She was shortly, very, very shortly behind me. I can't recall if she literally followed me down the stairs or what the time difference was, but she was really quickly behind me. We walked outside. She said that is her son and she said, Get him out of the car, he is upset. I said, Okay, I will take him out of the car. Just again I asked, He is your son, correct, ... and she said, Yes. I said, Okay. So I walked over and unhandcuffed him and she was very upset. Like I said, I unhandcuffed him and she said that – or I asked if she could identify who was in the other police car. She said it was [M.S.]. And I said, Okay. And she said that she didn't want him there so we left.
> Q. Okay. And was Mr. Mayes crying when you took him out of the patrol cruiser?
> ***
> A. Yes, he was.

Chief McClellan was also deposed in connection with this lawsuit. He had no recollection of the incident.

Plaintiff Brian Michael Mayes, Jr. testified at his deposition that on November 8, 2012, he and his friend M.S. were hanging out at his house. He testified:

> Q. What were you doing?
> A. Playing Xbox.
> Q. And how long had you been at the house playing Xbox before the police showed up?
> A. I would probably say 15, 20 minutes.
> ***
> Q. And what do you remember about when the police showed up?
> A. I can't really remember.
> ***
> Q. Where were you?
> A. Second floor.
> Q. Okay. Were you in your bedroom, a play room – where were you?
> A. Bedroom.
> Q. Okay. Was it your bedroom?
> A. Yes.
> Q. Okay. Did you hear the police knocking?

-10-

A. No.

Q. Okay. At some point did somebody tell you that they heard the police at the front door?

A. Yes.

Q. Who told you?

A. My friend, [M.S.].

Q. And at some point did somebody go down and open the front door?

A. Me.

Q. Before you went downstairs and opened the front door, did somebody open the window and talk to the police?

A. Yes.

Q. Okay. Who was that?

A. Me.

Q. Okay. And do you remember anything that the police said to you after you opened the window?

A. No.

Q. No. At any point do you recall one of the officers telling you that they had received a 9-1-1 call from the location of your house?

A. Yes.

Q. Who told you that? Do you know?

A. No, I don't.

***

Q. And when you opened the door, what happened?

A. He asked me about the 9-1-1 call and I told him that we didn't have a house phone.

Q. Okay. And did they ask you whether or not anybody had made a phone call?

A. No.

Q. Before you went downstairs and opened the door, did you and [M.S.] have any type of discussion about the fact that the police were there?

A. No.

Q. Did either one of you say: Oh, shit. Oh, shit. The police are here?

A. That was [M.S.] .

Q. Why was [M.S.] saying that?

A. I don't know.

***

Q. ... So you walked downstairs and you physically opened the front door?

A. I went to go open the front door and he drop kicked it open.

Q. He, meaning one of the police officers?

A. Yeah.

***

Q. ... Was there damage to the front door before the police showed up on November 8, 2012?

A. No.

Q. Okay. How long did it take you to go downstairs from the point you opened the window and said I'll come downstairs to open the door until the police drop kicked it open?

A. It only took me a minute to go downstairs.

Q. So as you were – well, where were you when the door flew open and the police drop kicked it open?

A. Like right in the middle of the living room.

***

Q. Okay. So when the door was drop kicked open, what happened next?

A. They put me in handcuffs and started throwing me around in my own house.

Q. They didn't say anything?

A. No.

Q. Okay. Did they ask you to produce any identification?

A. I think, but I can't remember.

***

Q. Run me through that. What do you mean, thrown around?

A. I mean, when they came in to put me in handcuffs, they put me in handcuffs and threw me out on the porch, hit my chest on my railing on the porch, and then they threw me face first in the cop car.

Q. Then, so I understand, they handcuffed you and dragged you outside and threw you into the railing outside, rather than throwing you around in the house?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And then after your chest got hit, they put you face first into the back of the squad car?

A. Yes.

Melanie Mayes' relevant testimony is as follows:

Q. What do you remember about November 8th, 2012, in regards to the case that you are suing about?

A. I was – I laid down to take a nap at around 11:00, 11:30ish, it is usually around noon. And I told my son that I didn't want anybody in the house while I was sleeping, house rules. I laid down. I was laying down for approximately 35 to 40 minutes. I heard a crash. I rolled over and went, Robert, I just heard a crash because he was sleeping.

Q. So you took a nap together?

A. Yes. I said that I was getting up to check out where the crash was coming from. And as I was putting on my nightgown to open my bedroom door, I heard static of a walkie-talkie in my hallway.

Q. So you got up to investigate the crash?

-12-

A. Um-hm.

\*\*\*

Q. So when you opened your door, what happened next?

A. I stuck my head out the door as I was putting my nightgown on, and I said, What is all the noise going on out here.

Q. And was there any response?

A. A police officer stepped out from standing against the wall out of my view. He stepped out from where the first bedroom is, the doorway next to mine (indicating).

Q. Okay.

A. It was inwards so I couldn't see him, but he stepped out into my view and said Hoosick Falls Police Department (indicating).

Q. What happened next?

A. I asked him what he was doing in my house.

Q. Was it just one officer upstairs or was there more than one?

A. One.

\*\*\*

Q. Okay. And how much time passed from the point that you said – where you called out until the officer identified himself?

A. I would say about a minute.

Q. So it was about a minute before somebody even responded to you?

A. Yes.

Q. And you stood there for a minute waiting for somebody to respond?

A. Yeah.

\*\*\*

Q. ... What happened next?

A. I asked him what he was doing in my house.

Q. What happened next?

A. He said somebody called 911 from my residence from a landline phone.

Q. And what did you respond?

A. I said that was impossible considering I didn't have a house phone.

Q. What happened next?

A. I told him to get out of my house and I would be right down to meet him on the front porch.

Q. What did the officer say?

A. He said, Okay, and ran down the stairs.

Q. What did you do next?

A. I called for my son Brian.

\*\*\*

Q. What happened next?

A. I walked down the flight of stairs to the front door to my front porch.

Q. Was the door open?

A. Yes.

Q. And who was there when you got down to the porch?

A. There was an officer and a guy in a blue suit with an emblem on his chest, an older guy.

Melanie Mayes then testified that when she went downstairs, she noticed and commented on the damage to the front door; that Officer Johnson again asked if anyone dialed 911 from the house; and that she then realized that Brian Mayes was in the police cruiser. She said she wanted him removed from the police car, and, after asking her one more question about a 911 call, Officer Johnson let him out of the car and removed the handcuffs.

Sanderson testified that after working a night shift he arrived home at around 8:30 a.m. on November 8, 2012 and went to bed at around 11:30 a.m. or noon. Melanie Mayes was not working that day. He testified:

> Q. ... So when did you become aware that there was something unusual going on at the house on November 8, 2012?
> A. Melanie woke me up asking me if I heard a crash. I said, No. I am a very sound sleeper. A few minutes later she said that she heard something in the hallway, it sounded like a CB radio. I know she got out of bed, called out into the hallway for somebody. Somebody did answer her. She told them to leave the house and that she would handle it. And she walked out of the room.
> Q. Did you overhear anything from what was being said in the hallway versus what you heard your fiancée saying?
> A. If I heard anything, I could not recall it right now. I was three quarters asleep.
> Q. So the only thing you can testify is that you heard what Melanie said?
> A. Right.
> Q. What is the next thing that you became aware of?
> A. It had to be about 15, 20 minutes later, Melanie didn't come back so I forced myself out of bed, got dressed and went downstairs to see what was going on.
> Q. Is that the only reason you decided to go downstairs?
> A. Yes.
> Q. And when you went downstairs, what happened next?
> A. ... Melanie and Brian, Jr. were in the living room. Brian was in tears complaining that his wrists hurt. I noticed that his wrists were all bruised and swollen and basically told them that we were headed over to Bennington ER to get him checked out.

-14-

**Warrantless Entry and Search – Applicable Law**

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Montanez v. Sharoh*, 444 F.App'x 484, 486 (2d Cir. 2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). One such exception – the "emergency aid" exception – permits police officers to enter a dwelling without a warrant "to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Montanez*, 444 F.App'x at 486 (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998)). "Courts must apply an objective standard to determine the reasonableness of the officer's belief, taking into account the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* (citation and quotation marks omitted).

Two Second Circuit cases specifically address the emergency aid exception in connection with 911 calls. The first, *Kerman v. City of New York*, held that police may not rely solely on an anonymous and uncorroborated 911 call from one location to justify a warrantless entry into a private dwelling at another location. 261 F.3d 229, 235-36 (2d Cir. 2001). Two years later, in *Anthony v. City of New York*, the Second Circuit held that a 911 call created exigent circumstances justifying a warrantless entry where the call came from the location to which the police responded and the caller described an immediate and deadly threat of harm to which she herself was being exposed at that location. 339 F.3d 129, 136 (2d Cir. 2003). *Anthony*

-15-

distinguished *Kerman* on the ground that "[t]he call in *Kerman* came from an anonymous caller who directed the police to a different location than that from which the call was placed, without verification or corroboration of the connection between the caller and the location to which the police responded." *Id*. The *Anthony* court continued: "The concern we expressed in *Kerman* regarding the reliability of anonymous and uncorroborated calls – that is, calls reporting an emergency at a different location and involving someone other than the caller – is not implicated here, where the caller expressed an immediate risk of harm to herself, and where the address from which the call was placed was verified." *Id*.

Other circuit courts have upheld warrantless emergency searches of locations from which 911 hang-up calls were placed. *See Johnson v. City of Memphis*, 617 F.3d 864, 869-70 (6th Cir. 2010) ("We hold that the combination of a 911 hang call, an unanswered return call, and an open door with no response from within the residence is sufficient to satisfy the exigency requirement."); *Hanson v. Dane County*, 608 F.3d 335, 337 (7th Cir. 2010) ("[A] 911 [hang-up] call provides probable cause for entry, if a call back goes unanswered. The 911 line is supposed to be used for emergencies only. A lack of an answer on the return of an incomplete emergency call implies that the caller is unable to pick up the phone – because of injury, illness (a heart attack, for example), or a threat of violence."); *United States v. Najar*, 451 F.3d 710, 718-20 (10th Cir. 2006) (finding emergency aid search was proper based on 911 hang-up call, disconnected call backs, and inconsistent statements by person who answered door; stating "a reasonable person could well be concerned that someone was trying to prevent communication with safety officials[.]").

Once an officer enters a residence under the emergency aid exception, he may properly

-16-

conduct a limited search of the premises if it is objectively reasonable for him to believe that the search is necessary to ensure the safety of someone therein. The search must be "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (internal quotation marks omitted). The Second Circuit has observed:

> As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which appeared to be present.... The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry – the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.

*Tierney*, 133 F.3d at 197-98 (quoting 3 *LaFave, Search and Seizure* § 6.6(a), at 400-01 (3d ed. 1996)). In *Tierney*, in response to reports of an ongoing domestic dispute, a police officer entered the plaintiff's house to ensure that none of the occupants was in need of medical aid or protection. Once inside, the officer encountered the plaintiff, whose conduct did not allay the officer's concern that she or her children were in danger from her boyfriend. The officer conducted a limited search to ascertain whether anyone else was in the house. The Second Circuit held that the officer was entitled to qualified immunity for the limited search, because it was reasonable to conclude that the plaintiff and her boyfriend were involved in a domestic dispute, that the boyfriend was still on the premises and waiting in another room for police to leave, and that plaintiff and her children were intimidated and in danger.

**Warrantless Entry and Search – Analysis**

In the instant case, defendants argue that a warrantless entry was justified to render emergency aid and assistance to a person whom Officer Johnson reasonably believed to be in distress and in need of assistance. This Court applies an objective standard, "taking into account the circumstances then confronting the officer, including the need for a prompt assessment of

-17-

sometimes ambiguous information concerning potentially serious consequences." [2] *Montanez*,

444 F.App'x at 486. The Court relies only on material facts that are undisputed, or, if disputed,

viewed most favorably to plaintiffs.

Defendants Chief McClellan and Officer Johnson responded to a 911 dispatch stating that

a call originating at 31 Lyman Street (or next door) sounded like two males were attempting to

enter a locked building, and that someone at that location had telephoned 911 but had left the line

open without speaking. Plaintiffs' Statement of Material Facts admits the following statement:

> On November 8, 2012, the 911 dispatcher advised the defendant officers that
> a burglary might be in progress at Plaintiffs' house. The dispatcher further
> advised that it was a 911 "open line" and the dispatcher could hear voices and
> noises. The dispatcher advised the defendant officers that one of the
> individuals heard on the call was "freaking out" about the police arriving.

(Citations to record omitted.)

Chief McClellan and Officer Johnson were the only two officers who responded to the

dispatch. Upon arriving at the address, they would necessarily have observed that it was a

residence. Officer Johnson went to the front door. He knocked, and two teenaged males

appeared in a second floor window. Officer Johnson asked them to come downstairs. From

Brian Mayes' testimony and the recording of the 911 call, it appears that about a minute elapsed

---

[2] Because the standard is an objective one, the Court is not concerned with Officer Johnson's
explanations for why he did what he did. As the Supreme Court observed:

> The reasons for looking to objective factors, rather than subjective intent, are clear.
> Legal tests based on reasonableness are generally objective, and this Court has long
> taken the view that evenhanded law enforcement is best achieved by the application
> of objective standards of conduct, rather than standards that depend upon the
> subjective state of mind of the officer.

*Kentucky v. King*, 563 U.S. 452, 464 (2011) (internal quotation marks omitted).

before Officer Johnson forcibly opened the front door.[3]  When Officer Johnson confronted the youths, Brian Mayes stated that he lived there.  Neither had photo identification, although one of them produced a hunting or fishing license.[4]  Officer Johnson patted down and handcuffed both Brian Mayes and M.S. and placed them in patrol cars.  He then returned to the residence and went upstairs.  On the second floor, a door opened and Melanie Mayes, wearing a nightgown, emerged and requested that Officer Johnson leave the house, which he did.  Melanie Mayes then came downstairs.  She identified Brian Mayes as her son, and Officer Johnson released him.

These facts, viewed objectively, justified a warrantless entry to render emergency aid and assistance to a person whom Officer Johnson reasonably believed to be in distress and in need of assistance.[5]  The fact that someone called 911 from the residence to which he was responding supported this belief, as did the fact that the 911 line remained open although no one spoke.

---

[3] For purposes of this motion, the Court accepts plaintiffs' contention that Brian Mayes did not consent to Officer Johnson's entry and search, but rather that Officer Johnson kicked the door open.

[4] Plaintiffs incorrectly state in their Statement of Material Facts that Brian Mayes "produced either a fishing or hunting license that identified him by name and address."  Plaintiffs cite solely to Officer Johnson's testimony, which states only: "One of them showed me a hunting license or a fishing license."

[5] The Second Circuit has endorsed the *Dorman* factors as "an illustrative sampling of the kinds of facts to be taken into account" in determining whether a warrantless entry was justified on the ground of an urgent need for law enforcement officers to render aid or take action.  *United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990) (citing *Dorman v. United States*, 435 F.2d 385, 391 (D.C.Cir. 1970)).  These factors are: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.  *Id.*  The Court does not focus on these factors because they are not closely applicable in a case such as the one at bar, where there is neither a particular suspect nor a known crime at the time of the entry.  The Court notes, however, that Chief McClellan and Officer Johnson had reason to believe that a burglary of an occupied house – a serious and potentially violent crime – was underway; that, if in fact a burglary was underway, the burglars were still in the residence; and that, once aware of police presence, the burglars would likely escape if not swiftly apprehended.  Thus, to this extent the *Dorman* factors support the conduct of defendants herein.

-19-

Combined with the 911 dispatcher's statements that two male voices were heard in the background and that it sounded like they were trying to enter a locked building, the limited information available to Officer Johnson supported the belief that a burglary of the residence was in progress and that the person who placed the call was an innocent occupant who was afraid or unable to speak, or had been prevented from doing so.[6] Based on these facts, it was objectively reasonable to conclude that the situation required immediate emergency action. Further, after Officer Johnson saw two young men through the second floor window, it was objectively reasonable for him to believe that they might be the burglars described by the 911 dispatcher. When about a minute passed after Johnson spoke with the youths through the window and they had not yet answered the door, it was objectively reasonable for him to believe that a forced entry was necessary to aid the 911 caller and prevent the two males from fleeing, destroying evidence, or injuring the caller. Further, the information Officer Johnson gained from encountering Brian Mayes and M.S. after the door was opened was insufficient to dispel this reasonable belief. In the absence of a photograph, the hunting or fishing license did not establish that Brian Mayes was who he said he was or that he resided in the home. Even after Officer Johnson had removed and secured Brian Mayes and M.S., it was reasonable to believe that the 911 caller was still in the residence and possibly ill or injured or otherwise in need of emergency aid. Under these circumstances, a limited emergency search was clearly justified. Once he went upstairs and spoke with Melanie Mayes, Officer Johnson had reason to conclude that there was no one in need of aid. It is undisputed that as soon as he spoke with Melanie Mayes and she directed him to leave the

---

[6] At some point the dispatcher telephoned Chief McClellan and told him that one of the male voices heard on the 911 call was "freaking out" about the arrival of the police. It is not clear whether or when Officer Johnson learned of this information.

house, Officer Johnson did so. Thus, Officer Johnson's search was strictly circumscribed by the exigencies that justified its initiation.

The Court's conclusion that Officer Johnson's search of the house was strictly circumscribed by the exigencies justifying its initiation is not undermined by plaintiffs' allegation in the amended complaint that, when they returned home several hours later, after having Brian Mayes' wrists examined at the emergency room, "they noticed that their home had been searched in their absence." The amended complaint adds: "Specifically, Brian's bedroom had been searched and Ms. Mayes' recreation room had been forcibly unlocked and sealed bins inside had been opened and searched."

In this regard, Brian Mayes testified that, while he was restrained in the patrol car, he saw two officers go back into the house. His testimony continued:

> Q. Okay. And how do you know that they started searching the different rooms?
> A. My step-dad checked his hobby, and all his bins that had the tops on them were all opened. And they went through my room and went through all my dressers.
> Q. Where does Mr. Sanderson keep his stuff?
> A. Downstairs.
> Q. In the basement or on the first floor?
> A. First floor.
> ***
> Q. Okay. And what did they do upstairs to your room?
> A. Went through my dressers.
> Q. How do you know that?
> A. Once they took me out of the handcuffs, I came back home from the emergency room and noticed all my dresser drawers are opened and clothes laying on my floor.
> Q. At any point did you notice if anything was missing?
> A. No.
> Q. Did Mr. [Sanderson] ever say that stuff was missing from his collection of materials? ...
> A. No.

On this subject, Melanie Mayes testified:

> Q. At any point did you notice anything was disturbed in your house after the police left on November 8th, 2012?
> A. When we got back from the emergency room, I came in the back door and I automatically noticed that my hobby room door was unbolt locked.
> ***
> Q. Okay. So somebody had opened it?
> A. Yes.
> Q. And was there anything disturbed in your room?
> A. When I opened the door, I noticed that all of Robert's bins that he kept his Hot Wheels in, all the duct tape and the lids were pulled open.
> Q. And that was duct taped?
> A. Yes, they were all duct taped closed.
> Q. Anything else?
> A. Not in that room.
> ***
> Q. Anything else that you noticed in the house that you felt was disturbed after you returned from the emergency room?
> A. Yes. My son went up to his bedroom and all his dresser drawers were open and shuffled through like they had been shuffled.
> ***
> Q. Anything else that you noticed that had been disturbed that we haven't talked about when you got back?
> A. Not that I noticed, but we were in the midst of moving stuff around and packing stuff because we were moving stuff from upstairs rooms to downstairs rooms in moving bins.

She stated that she did not see a police officer in Brian Mayes' bedroom at any time.

Robert Sanderson testified that, before they left for the emergency room, Melanie Mayes said the front door was not closing right and asked him to make sure it was shut securely before they left. He was able to lock it. He stated there was damage to the strike plate of the front door, which he repaired later in the day. He added he did not notice anything else about the condition of the house until they returned from the emergency room. He said that when they returned, they started looking around the house. He testified:

> Q. Why were you looking around the house?
> A. Well, Brian went upstairs, noticed that some of his stuff had been gone

through, dresser drawers open and that sort of stuff. Upon walking in the back door, Melanie had noticed her hobby room door unlatched and partially open. So we were looking through that to make sure that nothing was missing. And just wandering around the house afterwards to make sure that nothing was missing.

***

Q. Were any of your things disturbed at all?

A. Not that I noticed. Other than my Hot Wheels cases [in Melanie Mayes' hobby room], not that I noticed it.

Q. Who noticed it?

A. Melanie noticed it at first.

Q. And what did she tell you that she noticed?

A. That the duct tape had been peeled back so that the lids could be opened.

***

Q. And what is the purpose of having the duct tape on the bins?

A. At the time on the weekends I was doing flea marketing, I was setting up at flea markets so the lids were taped down because they rode in the back of my pickup.

Q. Anything else that you noticed that had been disturbed in the house other than what you have already told me?

A. Not that I can think of, no.

Apart from plaintiffs' and Sanderson's speculative and hearsay testimony, there is nothing in the record to suggest that Officer Johnson searched Brian Mayes' drawers or Sanderson's hobby bins. There is no evidence regarding the condition of Brian Mayes' drawers before the alleged search. Likewise, although Sanderson stated that he had duct-taped his hobby bins at some point, there is no evidence regarding when he had done so or how long the tape had been peeled back. It is equally plausible that Brian Mayes and/or M.S. had disturbed the drawers and bins searching for Brian Mayes' Xbox cords,[7] or that the duct tape on the bins had been peeled back previously for some other reason, or that Brian Mayes had not recently picked up his room,

---

[7] Melanie Mayes testified:
Q. Did you ask Brian what he and [M.S.] were doing before the police showed up?
A. Brian said he was looking for his color cords.
Q. What do you mean color cords?
A. For his Xbox. He was still in the process of unpacking his stuff from moving with me from his father. He was looking for his color cords.

or that, sometime between noon and the 911 call more than two hours later, while Melanie Mayes and Sanderson were sleeping, M.S. had been looking around the house for valuables.[8]  Indeed, plaintiffs do not know when this alleged search took place; the amended complaint alleges it took place while they were at the emergency room having Brian Mayes' wrists examined, whereas in their depositions, plaintiffs appear to assert that it occurred between the time Officer Johnson placed Brian Mayes in the patrol car and the time Melanie Mayes encountered him in the upstairs hall.[9]  Accepting plaintiff's version of events and resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the Court finds that plaintiffs' evidence that police conducted a search that exceeded the exigencies justifying its initiation is wholly speculative and would not permit a rational jury to return a verdict for plaintiffs on this issue.

The Court concludes that, based on the undisputed facts, viewing the disputed facts most favorably to plaintiffs, and resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the warrantless entry and limited search were justified in order to render emergency aid

---

[8] Melanie Mayes testified that M.S. was "sort of a klepto.  Every time he came to the house stuff ended up missing when he left."  Asked what type of things he stole, she said: "Ipods, MP3s, headphones, little items, ... little knickknacks off the shelves, a passing pen, just – I don't know.  He just liked to take stuff."

[9] Although not necessary to this decision, the Court observes that – accepting plaintiffs' version of the facts – it would have been virtually impossible for Officer Johnson to have conducted the alleged excessive search between when he first entered the house and when Melanie Mayes saw him in the upstairs hall.  This was necessarily a brief time period; Melanie Mayes testified that she was awakened by a "crash" – allegedly when Officer Johnson kicked the door open – and that she then put on her nightgown, looked out of the bedroom door, and, within a minute, saw Officer Johnson in the upstairs hall.  To find that Officer Johnson conducted an excessive search, the jury would have to accept the unlikely scenario that, during this brief time period, Officer Johnson entered the house, encountered Brian Mayes and M.S. in the living room, threw Brian Mayes around the house and porch, handcuffed him, placed him in the patrol car, returned to the house, broke open the bolt on Melanie Mayes' hobby room on the first floor, peeled up the duct tape and searched Sanderson's hobby bins, went upstairs, entered Brian Mayes' room, searched the dresser drawers, and then left the room, whereupon Melanie Mayes saw him in the second-floor hallway.

and assistance to a person whom Officer Johnson reasonably believed to be in distress and in need of assistance. Moreover, plaintiffs have adduced no non-speculative evidence supporting their claim that Officer Johnson's search of the house exceeded the exigencies justifying its initiation. No reasonable factfinder could find in plaintiffs' favor on these issues. Defendants are entitled to summary judgment dismissing the fourth cause of action.

**Detention of Brian Mayes**

The first cause of action against all defendants under section 1983 claims that Brian Mayes' person was unreasonably seized in violation of the Fourth Amendment. The Fourth Amendment protects the right of the people "to be secure in their persons ... against unreasonable searches and seizures[.]" The general rule is that "Fourth Amendment seizures are 'reasonable' only if based on probable cause" to believe that the individual has committed a crime. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). In some circumstances, however, police may detain without probable cause to arrest. *See Bailey v. United States*, 133 S.Ct. 1031, 1037 (2013); *Michigan v. Summers*, 452 U.S. 692, 705 (1981). Officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. Such detentions are appropriate "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Muehler v. Mena*, 544 U.S. 93, 98 (2005). The *Summers* court recognized three important law enforcement interests that, taken together, justify such detention: officer safety; facilitating the completion of the search; and preventing flight. 452 U.S. at 702-03. To detain in such circumstances, law enforcement officers do not need particular suspicion that the detained person is involved in criminal activity or poses a specific danger to the officers;

-25-

rather, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler*, 544 U.S. at 98 (internal quotation marks omitted). "Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id*. at 98-99. "[T]he need to detain multiple occupants [may make] ... the use of handcuffs all the more reasonable." *Id*. at 100. As the *Summers* court noted, the risk of harm to officers and occupants is minimized "if the officers routinely exercise unquestioned command of the situation." 452 U.S. at 703 (quoted in *Muehler*, 544 U.S. at 99).

Applying the same rationale, courts have authorized detention of an occupant during a warrantless search based on exigent circumstances. *See, e.g., United States v. McCoy*, 407 F.App'x 514, 515 (2d Cir. 2010); *Brown v. City of New York*, 2015 WL 427942, at *5 (E.D.N.Y. Feb. 2, 2015); *United States v. Williams*, 2015 WL 429087, at *18 (W.D.N.Y. Feb. 2, 2015) (citing cases), *report and recommendation adopted* 2015 WL 3454430 (W.D.N.Y. May 29, 2015); *United States v. Obbanya*, 2012 WL 851129, * 5 (N.D.Cal. 2012). Indeed, the law enforcement interests justifying the detention of occupants during a search pursuant to a warrant – *i.e.*, officer safety, facilitating the search, and preventing flight – may be magnified during an emergency-aid search, where the officers have reason to believe someone inside may be in need of immediate assistance, possibly due to the detainee's actions.

In the case at bar, the Court has found that the emergency aid search was justified by the 911 dispatcher's statement that it sounded like two males were attempting to enter a locked building and that someone in the building had telephoned 911 but had left the line open without speaking. Based on this finding and on additional undisputed facts, the Court holds that the

detention of Brian Mayes during the exigent search was reasonable. Officer Johnson and Chief McClellan were the only two officers who responded to the 911 dispatch. Upon arrival at the 31 Lyman Street address, Officer Johnson went alone to the front of the house, where he saw two teenaged males in the second floor window. It is unclear when Chief McClellan joined him; in any event, the officers needed to detain both Brian Mayes and M.S. while conducting an urgent search for the person whom they believed had placed the 911 call from inside the house. In these circumstances, the use of handcuffs was reasonable to protect the safety of the two officers, the two detainees, and anyone who might have been in the house, as well as to prevent the detainees' flight until the situation was resolved. In addition, the detention was necessarily brief; it is undisputed that Officer Johnson released Brian Mayes as soon as Melanie Mayes identified him as her son and requested his release, and, as noted, only 16 minutes elapsed between the Officer Johnson's arrival at the residence and the termination of the incident.

Based on undisputed facts, viewing the disputed facts most favorably to plaintiffs, and resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the Court concludes that no reasonable jury could find that the brief detention and handcuffing of Brian Mayes was not objectively reasonable. Therefore, there is no genuine issue for trial regarding Brian Mayes' Fourth Amendment claim against both defendants for unreasonable seizure of his person. Summary judgment is granted dismissing the first cause of action.

**Excessive Force**

The second cause of action in the amended complaint is a section 1983 claim by Brian Mayes against all defendants for excessive force in violation of the Fourth Amendment. Brian Mayes contends that summary judgment must be denied on this issue due to "substantial factual

-27-

disputes regarding the amount of force used to handcuff Plaintiff and place him in the back of the patrol car." As noted above, inherent in the authorization to detain an occupant of the place to be searched is the authority to use reasonable force, including handcuffs, to effectuate the detention. *See Muehler*, 544 U.S. at 98-99. Law enforcement officers' use of force in an arrest is excessive in violation of the Fourth Amendment if it is "objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). Specifically with respect to an excessive force claim based on the use of handcuffs, courts evaluate the reasonableness of the force used in light of the following factors: (1) whether the handcuffs were unreasonably tight; (2) whether the defendants ignored pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. *See Jackson v. Village of Ilion*, 2016 WL 126392, at *7 (N.D.N.Y. Jan. 11, 2016); *Dunkelberger v. Dunkelberger*, 2015 WL 5730605, at *14 (S.D.N.Y. Sept. 30, 2015); *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013); *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (citing cases). "This particularized standard reflects the need to balance the right to use some degree of coercion, including the use of tight handcuffs to prevent the arrestee's hands from slipping out, with the use of overly tight handcuffing that could constitute excessive force." *Dunkelberger*, 2015 WL 5730605, at *14 (citations and quotation marks omitted). Accordingly, there is a consensus among district courts in the Second Circuit that "tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Id*. (quoting *Usavage*, 932 F.Supp.2d at 592 (brackets and internal quotation marks omitted)).

Considering first the claim of excessive force apart from the handcuffing, the Court notes

that Brian Mayes' testimony that he was "thrown around" is vague, inconsistent, and conclusory.

He testified:

> Q. Okay. So when the door was drop kicked open, what happened next?
> A. They put me in handcuffs and started throwing me around in my own house.
> Q. They didn't say anything?
> A. No.
> ***
> Q. Run me through that. What do you mean, thrown around?
> A. I mean, when they came in to put me in handcuffs, they put me in handcuffs and threw me out on the porch, hit my chest on my railing on the porch, and then they threw me face first in the cop car.
> Q. Then, so I understand, they handcuffed you and dragged you outside and threw you into the railing outside, rather than throwing you around in the house?
> A. Uh-huh.
> Q. Yes?
> A. Yes.
> Q. And then after your chest got hit, they put you face first into the back of the squad car?
> A. Yes.
> ***
> Q. Okay. Did you feel anything after they put you into the railing?
> A. No.

There is no other evidence supporting this claim. At first Brian Mayes stated he was thrown around in the house, then he stated he was not thrown around in the house but rather on the porch. There is no evidence that Brian Mayes suffered even momentary discomfort from this alleged event; to the contrary, he stated that he did not "feel anything after they put [him] into the railing" and that he had no marks or bruises on his chest from being thrown into the railing. In their Statement of Material Facts, plaintiffs admit that "Brian Mayes did not suffer any permanent injuries, scarring or bruising to his chest as a result of making contact with the railing." Although plaintiffs assert in their Statement of Material Facts – without citation to the record – that Brian Mayes "suffered pain as a result of being thrown into the railing," there is no support for this

-29-

allegation in Brian Mayes' deposition testimony or anywhere else in the record. Apart from the complaints about his wrists, there is no mention of any pain or injury in the medical records, not even in the emergency room records from the date of the incident. Based on the undisputed facts, viewing the disputed facts most favorably to plaintiffs, and resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the evidence that Brian Mayes was subjected to unreasonable force by being thrown around is insufficient to support a claim of excessive force.

With respect to the handcuffing, Brian Mayes testified as follows:

> Q. Did you complain about the handcuffs being too tight before or after they put you in the car?
> A. After.
> Q. Well, was there a cop in the car with you?
> A. No.
> Q. Was the window open?
> A. No.
> Q. So who were you talking to then when you said the handcuffs are too tight?
> A. My mom when they let me out.
> Q. Okay. As they were taking the cuffs off, you said they were too tight?
> A. Yeah.

Thus, Brian Mayes' testimony is that he did not complain that the handcuffs were too tight until he was speaking to his mother while they were being removed. There is no record evidence that would permit a jury to find that defendants ignored pleas that the handcuffs were too tight.

Melanie Mayes testified that "as soon as they un-handcuffed [Brian Mayes], he started screaming in pain and crying hysterically." She said she looked at his hands, which were "purplish red and he got raised, really raised like rubber band bruising around both of his wrists and he kept crying hysterically that they hurt." Melanie Mayes and Brian Mayes went into the living room, and then Sanderson came downstairs, and they prepared to go to the emergency room.

-30-

The report from Southwestern Vermont Medical Center regarding Brian Mayes'

emergency room visit on the day of the incident, signed by Jeffrey A. Yucht, M.D., identifies his

chief complaint as "Bilateral wrist discomfort." The report states that x-rays were taken; that they

showed no evidence of acute abnormality; that an official reading of the x-rays was pending; and

that the symptoms "are consistent with contusions, abrasions and possible crush injury." Dr.

Yucht added: "I suspect there may be a slight peripheral neuropathy which should improve over

time." He directed Brian Mayes to follow up with the local orthopedist and his private physician.

The final diagnosis was: "1. Wrist contusion. 2. Peripheral neuropathy. 3. Wrist abrasions." Brian

Mayes was given Tylenol by mouth for his discomfort.

Plaintiffs admitted in their response to defendants' Statement of Material Facts that "[a]ny

marks on or swelling of Brian Mayes' wrist went away in a couple days following November 8,

2012." Brian Mayes testified to the same effect.

Melanie Mayes testified that about a week after the incident, she took Brian Mayes to be

seen by his primary care physician, Heidi Rasmussen, M.D., regarding his wrists. There is no

medical record of such a visit. The only relevant medical report from Dr. Rasmussen pertains to a

visit on February 12, 2013, more than three months after the incident, in which Brian Mayes

reported pain in his left wrist. Dr. Rasmussen wrote:

> His main concern is some left wrist pain that has been ongoing since ... the
> police ... handcuffed him and put him in the back seat of the police car[.] ... He
> says that ever since then he's been having pain in the left wrist. He is
> concerned that he may have nerve damage. He denies problems with the
> hand. No numbness, tingling, weakness. He gets some shooting pains and
> some tenderness periodically around the radius. Initially he had some bruising
> and swelling. He has never sought medical attention for this.

She commented with respect to the wrist pain: "I explained to him that it is unlikely that we will

find anything of significance. He is accepting of that and is aware that further treatment may not be available."

Upon Dr. Rasmussen's referral, William J. Smith, M.D., an orthopedic specialist, saw Brian Mayes on February 20, 2013, to evaluate Brian Mayes' complaint of pain in his left wrist. Dr. Smith took an x-ray of the left wrist and a comparison view of the right wrist. The examination was completely unremarkable, and Dr. Smith reported no evidence of injury of any kind in either wrist.[10] Dr. Smith's report states:

> PHYSICAL EXAMINATION: The clinical examination today demonstrates left and right wrist range of motion are completely symmetrical and equal. There is no pain at end range flexion or extension. There is no swelling. Watson test is stable and pain-free bilaterally.
>
> He has no evidence of any swelling in the left hand and normal sensory when comparing the radial to ulnar digits. The dorsal radial hand is equal to that of the dorsal ulnar hand to light touch. The superficial radial nerves are palpable and they are nontender. There is no evidence of any Tinel's or neuromas here. There are no wounds or breakdowns or signs of any restrictive or tight-fitting jewelry at this point in time.
>
> RADIOGRAPHS : X-rays of the left wrist shows a normal anatomy of the scapholunate and angle is at 80+ degrees. There is no dorsal or volar tilting of the lunate. It is colinear with the capitate and radius. I took a comparison view of the opposite right wrist and he has similar appearance here, so this is essentially normal for him.
>
> I really do not find any evidence of Waardenburg syndrome or irritation of the superficial radial nerve. I do not find any wrist instability at this time.
>
> I do not think there is anything here that I can help him with from the surgical perspective. If numbness is an issue or complaint then perhaps he should visit with a neurologist and they can study him further for this. Typically one would not develop carpal tunnel syndrome after this kind of event unless there

---

[10] Melanie Mayes testified that Dr. Smith said that Brian Mayes' right wrist "had a chip in the bone or something and that he couldn't really tell if there was nerve damage or not." There is no support for this assertion in Dr. Smith's report. This hearsay allegation has no probative worth.

was a wrist fracture or injury which does not appear to be the case.

Apart from the doctors' visits described above, Brian Mayes has not seen any physician and has sought no treatment regarding his wrists. He has never seen a neurologist.

Brian Mayes testified that since the handcuffing he occasionally experiences tingling in his right hand and/or shooting pain in his right arm, particularly when he lifts a heavy object. He testified:

> Q. ... When you were at the emergency room do you recall complaining of tingling in your wrists?
> A. I think so. Yeah.
> Q. Did the tingling last a long time?
> A. No.
> Q. So it was kind of something that you were feeling when you went to the emergency room, but then at some point shortly thereafter it went away?
> A. Yeah.
> Q. Has the tingling ever come back?
> A. Once in a while. Yeah.
> Q. How often does it happen?
> A. Not too often.
> Q. Is there any particular activity that causes it to bother you?
> A. If I'm lifting anything heavy.
> ***
> Q. And that's only when you do heavy lifting, or is there any other time that you feel it?
> A. That's the only time.
> Q. And has that been fairly consistent since November of 2012?
> A. Yes.
> Q. Did you ever have any tingling in the hand before that?
> A. No.
> ***
> Q. Okay. Well, the records I have indicate that you saw Dr. Smith on February 20th of 2013. All right? In February of 2013, were you still having any type of numbness or tingling?
> A. Not that I can think of.
> ***
> Q. Okay. Have you been to see a doctor this year, at all?
> A. This year? No.
> Q. Okay. When is the last time you recall going to see a doctor?
> A. I can't remember.

Q. Okay. We know that the record shows that you went in February of last year. In the last year or 15 months, have you had any real problems with your wrists that you can tell me about?

A. My right one?

Q. ... Let's start with your right wrist, because that's the one you mentioned.

A. I can't lift anything heavy with it.

Q. Why not?

A. Because I get sharp pains going up through it.

Q. When did the sharp pains start?

A. I would probably say right after they took the handcuffs off.

Q. So the sharp pains started immediately when they took the handcuffs off you?

A. I think so. Yeah.

Q. Okay. Was that one of the reasons you also went to the emergency department?

A. Yes.

Q. And were the sharp pains in both wrists or just one?

A. Just one.

Q. Which one?

A. The right.

Q. The left wrist didn't bother you?

A. No.

***

Q. Where were you feeling the sharp pain, if you could show me?

A. It would shoot up through my wrist in my elbow.

***

Q. Okay. And how often do you feel the radiating pain?

A. Not too often. It only does the pain when I lift up something heavy.

***

Q. Other than the sharp pains, any other complaints that you had since November 8, 2012 that you're attributing to your treatment by the police?

A. Not that I can remember.

Q. Do you take any type of pain medication?

A. No.

Q. Okay. Does it affect your ability to sleep?

A. No.

Q. Okay. So it's just when you're using it?

A. Uh-huh. Yes.

Q. Okay. And over the course of a week how often would you say you feel the sharp pains?

A. I don't know.

Q. You couldn't even guess for me?

A. No.

***

> Q. My understanding is that you've got the tingling, shooting pain in your arm; correct?
> A. Yes.
> Q. And that's in the right arm?
> A. Yes.
> Q. Since November 8th, other than what you identified in the pictures [taken on the day of the incident], you have not had any pain or discomfort in your left wrist or arm?
> A. No.

Melanie Mayes testified at length regarding her observations of Brian Mayes' symptoms. An excerpt from this testimony follows:

> Q. Are you taking him to see any doctor for an evaluation of potential nerve damage?
> A. No.
> Q. Why not?
> A. I don't know.
> Q. Okay.
> A. He – it is not every day. It is just certain stuff.
> Q. Like what?
> A. Like taking a gallon of milk out of the refrigerator, if he would go to grab it, it would shake (indicating), the gallon would shake to the counter. If he would wake up, sometimes he would lay on it wrong and he would get a sharp pain from the back of his wrist that shoots up his arm behind his elbow (indicating).
> Q. Just the right one?
> ***
> A. Well, yeah, the right one.
> ***
> Q. How often would you say you see him flexing his hands because he has got numbness?
> A. I would say at least once or twice a week....
> ***
> Q. He has complained of radiating pain periodically?
> A. Yes.

Sanderson testified that occasionally Brian Mayes repeatedly "flexes" one hand or the other.

The Court is aware that medical proof is not always required to establish a claim of excessive force. *See Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987). On this record, however,

-35-

there is no evidence – medical or otherwise – supporting a finding of excessive force based on tight handcuffing causing injury beyond temporary discomfort. Brian Mayes relies on three medical reports. The first, the emergency room report by Dr. Yucht from the date of the incident, reports abrasions and contusions on both wrists and states: "I suspect there may be a slight peripheral neuropathy which should improve over time." There is, however, no subsequent medical evidence that Brian Mayes actually did suffer peripheral neuropathy or any other injury to his wrists. Neither Dr. Rasmussen nor Dr. Smith, both of whom examined Brian Mayes in February 2013, reported any objective evidence of wrist injury. In particular, the report from Dr. Smith, the orthopedic specialist, concluded that Brian Mayes' wrists were normal. Brian Mayes never saw a neurologist and sought no further evaluation or treatment. Therefore, the only medical evidence of any injury from the handcuffing is found Dr. Yucht's report noting bruising and abrasions on the date of the incident. Brian Mayes was given Tylenol by mouth for his discomfort. Such evidence of temporary discomfort, without more, does not support a claim of excessively tight handcuffing.

There is no other evidence upon which a reasonable jury could find that the handcuffs caused injury beyond temporary discomfort. As noted, there is evidence that, on the date of the incident and for a few days thereafter, plaintiff had marks and swelling on his wrists; however, plaintiffs admit that "[a]ny marks on or swelling of Brian Mayes' wrist went away in a couple days following November 8, 2012," and Brian Mayes testified to the same effect. On the facts of this case, Brian Mayes' testimony regarding his symptoms does not create a triable issue. This is because, although he testified that he has suffered from occasional tingling, numbness, and shooting pain since the handcuffing, he stated that they have occurred solely in the right hand and

-36-

arm and that he has had no symptoms in his left hand and arm. However, the reports by Drs. Rasmussen and Smith, who saw plaintiff about three months after the incident for evaluation of his alleged handcuffing injury, state that he complained only of symptoms in his left hand. Because Brian Mayes did not complain of symptoms in his right hand and arm at these two doctors' examinations, no reasonable factfinder could conclude that the symptoms in the right hand and arm were caused by the handcuffing as opposed to, for example, his subsequent injury to his right shoulder from carrying a ladder, or repetitive stress injury from playing Xbox,[11] or some other cause. On this record, a jury cannot be permitted to speculate that the right-wrist symptoms about which Brian Mayes testified somehow relate back to the "slight peripheral neuropathy" which Dr. Yucht "suspected" on the day of the incident or are otherwise related to the handcuffing, particularly in the face of Dr. Smith's affirmative finding that both left and right wrists were normal. The anecdotal and hearsay testimony of Melanie Mayes and Sanderson does not assist Brian Mayes in creating a question of fact on this issue. There is no non-speculative support for a finding that defendants subjected Brian Mayes to excessively tight handcuffing which caused more than temporary discomfort.

To conclude on the issue of excessive force, the Court has determined that the evidence

---

[11] Brian Mayes testified:
     Q. How do you spend your free time?
     ***
     A. I usually play Xbox.
     Q. Any particular games?
     A. Far Cry 2. Assassin's Creed. Call of Duty Ghosts. And usually Grand Theft Auto 5.
     ***
     Q. What do you do during the day, other than play Xbox?
     A. Nothing really.

that Brian Mayes was "thrown around" is vague and conclusory and insufficient to support a claim of excessive force. Regarding handcuffing, there is no evidence that police ignored Brian Mayes' pleas that the handcuffs were too tight, and no non-speculative evidence that the handcuffs caused injury beyond temporary discomfort; accordingly, there is no support in this record for a finding that defendants used unreasonable force in handcuffing Brian Mayes. Based on the undisputed facts, viewing the disputed facts most favorably to plaintiffs, and resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the Court finds no evidence that would permit a reasonable jury to conclude that the force used to detain Brian Mayes during the search was objectively unreasonable in light of the facts and circumstances. There is no genuine issue for trial, and summary judgment is granted dismissing the second cause of action for excessive force.

**Assault and Battery**

The fifth cause of action is a claim by Brian Mayes for assault and battery under New York common law. "[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical." *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir.1991)). Having held that no reasonable finder of fact could conclude on this record that defendants applied excessive force, the Court grants summary judgment dismissing the fifth cause of action.

**Intentional and Negligent Infliction of Emotional Distress**

The sixth cause of action is a state law claim by both plaintiffs for intentional and negligent infliction of emotional distress. The Second Circuit recently explained the elements of

-38-

a claim of intentional infliction of emotional distress as follows:

> In order for the plaintiff to prevail in a case for liability under intentional infliction of emotional distress, four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. Liability for intentional infliction of emotional distress requires conduct that exceeds "all bounds usually tolerated by decent society.

*Dotel v. Walmart Stores, Inc.*, 2016 WL 158466, at *2 (2d Cir. Jan. 14, 2016) (citations, alterations, and quotation marks omitted). The Court has determined that defendants' conduct in entering and searching the house and detaining Brian Mayes was objectively reasonable and that no reasonable finder of fact could conclude on this record that defendants applied excessive force. There is therefore no basis upon which a reasonable jury could find that defendants' conduct was extreme and outrageous. Likewise, there is no basis to find that defendants acted negligently. Summary judgment is granted dismissing the sixth cause of action.

**Qualified Immunity**

In the alternative, defendants move for summary judgment on the ground of qualified immunity. "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects public officials from liability where either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (citation omitted). "The qualified immunity

standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted) (quoted in *Garcia*, 779 F.3d at 92). Thus, "[e]ven where rights are clearly established, an actor will not be held liable if it was objectively reasonable for him to believe at the time of the challenged action that his actions were lawful." *Posr*, 944 F.2d at 95. In deciding whether an officer's conduct was objectively reasonable for purposes of qualified immunity, courts "look to the information possessed by the officer at the time," but "do not consider the subjective intent, motives, or beliefs of the officer." *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (internal quotation marks omitted). The burden is on defendants to establish their entitlement to qualified immunity. *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013), *cert. denied sub nom. Annucci v. Vincent*,135 S.Ct. 948 (2015).

Certainly, plaintiffs' Fourth Amendment protections against unreasonable entry of their home, unreasonable detention, and excessive force are clearly established. The Court has found, however, that on the facts herein, no reasonable jury could find it was objectively unreasonable for defendants to enter plaintiffs' home and detain Brian Mayes. For the same reasons, the Court finds that defendants are entitled to qualified immunity from these claims on the ground that it was objectively reasonable for them to believe that their conduct did not violate plaintiff's rights. In addition, the Court has found that no reasonable finder of fact could conclude on this record that defendants applied excessive force. Thus, it was it was objectively reasonable for defendants to believe that their conduct in this regard did not violate plaintiff's rights.

As for the New York State causes of action, under New York law, "discretionary municipal acts may never be a basis for liability[.]" *McLean v. City of New York*, 12 N.Y.3d 194,

202-03 (2009); *accord Lore v. City of Syracuse*, 670 F.3d 127, 166 (2d Cir. 2012) (citing *Tango v. Tulevich*, 61 N.Y.2d 34, 40-41 (1983)); *Denis v. Town of Haverstraw*, 852 F.Supp.2d 405, 410-12 (S.D.N.Y. 2012).  New York courts define discretionary decision-making as "the exercise of reasoned judgment which could typically produce different acceptable results."  *Tango*, 61 N.Y.2d at 41.  In the case at bar, defendants' response to the 911 call and the evolving situation at 31 Lyman Street necessitated that they use reasoned judgment in the exercise of their discretionary authority as police officers.  *See id.*; *Johnson v. City of New York*, 15 N.Y.3d 676, 680-81 (2010); *Mon v. City of New York*, 78 N.Y.2d 309, 313 (1991).  Thus, defendants are entitled to qualified immunity dismissing the state law causes of action.

### *Monell* claim

The fourth cause of action is a section 1983 claim by both plaintiffs against the Village for municipal liability under *Monell v. New York City Dept. of Social* Services, 436 U.S. 658, 694 (1978).  Under *Monell*, a municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue.  *Monell* "extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).  Thus, where a plaintiff cannot establish a violation of his constitutional rights, there cannot be a *Monell* claim against the municipality.  *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).  "Unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable."  *Id.*

Here, based on the undisputed facts, viewing the disputed facts most favorably to

plaintiffs, and resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the Court has concluded that defendants' entry and search of the premises and detention of Brian Mayes was reasonable under the Fourth Amendment, and further that plaintiffs have adduced no evidence that would permit a reasonable jury to find that defendants used excessive force. Therefore, there is no basis for holding the municipality liable.[12] *Id*. Summary judgment is granted dismissing the fourth cause of action against the Village.

## CONCLUSION

It is therefore

ORDERED that defendants' motion (Dkt. No. 41) for summary judgment is granted; and it is further

ORDERED that the action is dismissed in its entirety with prejudice.

---

[12] On the other hand, if the Court were to grant summary judgment in favor of Chief McClellan and Officer Johnson on the ground of qualified immunity, plaintiff would not necessarily be precluded from pursuing his claims against the Village. *See Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013). On this record, however, there is no evidence of a direct causal link between any municipal failure to train and any constitutional deprivation, and summary judgment dismissing such a claim would be appropriate. *See City of Canton v. Harris*, 489 U.S. 378, 386, 391 (1989). "Monell does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Plaintiffs' failure to train claim is pleaded in a conclusory fashion ("Chief Ashe has failed to institute appropriate written policies on a variety of subjects including use of force, seizure, warrantless arrest and probable cause for arrest and prosecution."). This defect is not corrected in the record on this motion. For example, plaintiffs' memorandum of law argues broadly that the Village "failed to adopt appropriate policies and procedures and also failed train their officers regarding basic Fourth Amendment principles" and that "a jury would likely determine that the Defendants did not receive appropriate training on the Fourth Amendment, which directly affected their ability to address the occurrence at issue here." Plaintiffs do not specify or produce evidence of any failure to train or inappropriate policy leading to any particular unconstitutional conduct and thus cannot make out a direct causal link between the alleged municipal failing and any constitutional deprivation.

IT IS SO ORDERED.

February 12, 2016
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge